**TOLEDO ELECTRICAL JOINT AP-PRENTICESHIP and Training Trust Fund, Plaintiff–Appellant,**

v.

**William Kenneth PATCHEN, Defendant–Appellee.**

**No. 00–3096.**

United States Court of Appeals, Sixth Circuit.

July 17, 2001.

---

Before GUY, NORRIS, and SILER, Circuit Judges.

PER CURIAM.

William Kenneth Patchen signed two agreements with Toledo Electrical Joint Apprenticeship and Training Trust Fund. The Fund was to advance money and materials for training Patchen to earn his journeyman's card as an electrician. The Fund was to be repaid in cash in the event Patchen within ten years of graduation went to work for a non-union electrical contractor, or became an employer engaging in electrical work, which he did. In a breach of contract action brought by the Fund against Patchen, the district court held that Patchen signed the agreements under duress and entered summary judgment in his favor. On appeal, the Fund argues that duress is not an available defense in this type of action, and that Patchen did not sign the agreements under duress. After a review of the record and the arguments presented on appeal, we reverse.

## I.

The Fund is a jointly administered, multi-employer, employee welfare benefit plan under ERISA that operates a five-year apprenticeship program. In the early 1980s, William Patchen, also known as William Koch, sought and was denied admission to the program on several occasions. He was ultimately admitted to the program in 1989, and on February 14 he paid a non-refundable deposit of $165 for tuition.[1] On June 1, 1989, in conjunction with the program, Patchen signed a federally mandated indenture agreement under which he was to be paid thirty percent of the prevailing rate for electricians in Toledo; the percentage of his pay would increase during each year of the five-year program.[2]

1. Patchen was required to pay tuition while in the program. On average, he paid $458 per year.

2. Patchen was willing to accept reduced wages throughout the course of the program because successful completion of it resulted in a journeyman's card from the local union.

Shortly after beginning the program, Patchen was asked to sign a "Scholarship Loan Agreement," under which he was obligated to repay the Fund in cash or in kind for the five years of tuition to be provided to him.[3] Patchen signed the agreement and remained in the program. On November 11, 1992, Patchen was asked to sign the "Apprenticeship Training & Scholarship Agreement," an updated version of the 1989 loan agreement.[4] He signed this agreement and continued in the program until his graduation in June of 1994.[5]

Following graduation, Patchen worked for contributing employers for several years until he was laid off in June of 1997. He then started his own business, Patchen Electric, even though he was prohibited from doing so by the terms of the 1992 agreement.[6] When Patchen refused to pay the Fund the outstanding tuition he owed, the Fund sued him for breach of contract in federal court, seeking $2,949.47 in damages and an injunction to restrain him from engaging in employment violative of the 1992 agreement.

Both parties moved for summary judgment, with Patchen relying, in part, on the defense of duress. The district court agreed with Patchen, granted his motion, and denied the Fund's motion. This appeal followed.

## II.

We review *de novo* the district court's award of summary judgment in Patchen's favor. *See Mktg. Displays, Inc. v. TrafFix Devices, Inc.*, 200 F.3d 929, 933 (6th Cir. 1999), *cert. granted,* 530 U.S. 1260, 120 S.Ct. 2715, 147 L.Ed.2d 981 (2000). The Fund argues that the district court erred in granting Patchen's motion because duress is not a viable defense as a matter of law or under the facts of this case.[7]

▮▮▮ Under Ohio law, the following three elements are necessary to establish the defense of duress: "[F]irst, that one side involuntarily accepted the terms of another; second, that circumstances permitted no other alternative; and third, that the opposite party's coercive acts caused those circumstances." *Quebodeaux v. Quebodeaux,* 102 Ohio App.3d 502, 657

---

3. The agreement provided in part: "The Scholarship Loan may be repaid by the Apprentice in full either in cash or by in kind [*sic*] credits[.]" Under the agreement, in kind credits were earned by the apprentice's post-graduation employment with employers that contributed to the local committee of the Fund or to another joint apprentice and training committee affiliated with a local union of the International Brotherhood of Electrical Workers.

4. The 1992 agreement expressly superseded the 1989 agreement with respect to the cost of the prior years of training. Under the new agreement, each year Patchen worked for a contributing employer, ten percent of his total obligation to the Fund for tuition would be satisfied.

5. When Patchen graduated from the program, his total debt to the Fund was $4,213.55.

6. Under that agreement, the apprentice agrees not to become an employer engaging in electrical work until he has repaid his tuition by working for contributing employers for ten years after graduation. If he does so, he is considered in default of the agreement, and the local committee of the Fund may proceed to recoup the amount of the training scholarship less any credit percentages already earned by the apprentice.

7. The Fund contends that duress is not a defense in ERISA actions, or in common law breach of contract actions where the allegedly breaching party has already ratified the contract by reaping its benefits. The district court held that public policy mandates that such a defense exists in an ERISA action, but did not discuss the Fund's ratification argument. Because we reverse the award of summary judgment in Patchen's favor on other grounds, we do not address the Fund's contention.

N.E.2d 539, 541 (Ohio Ct.App.1995) (citing *Blodgett v. Blodgett,* 49 Ohio St.3d 243, 551 N.E.2d 1249, 1251–52 (Ohio 1990)).[8] "It is not enough to show that one assented [to the agreement] merely because of difficult circumstances that are not the fault of the other party." *Blodgett,* 551 N.E.2d at 1251–52.

 In support of his defense, Patchen offered evidence that he asked for and was denied copies of the 1989 and 1992 agreements and the opportunity to consult with an attorney before signing them. Patchen also claimed that he was told that he would be kicked out of the program if he refused to sign them. The Fund did not offer contradictory evidence in opposition to Patchen's motion, but argued instead that duress was not an available defense, and that the Fund could lawfully insist that Patchen repay the cost of tuition expended on his behalf. In granting Patchen's motion, the district court noted that the Fund failed to dispute that the elements of duress were satisfied in Patchen's case.[9] Despite the Fund's failure in this regard, our independent review of the record convinces us that Patchen did not sign the agreements under duress and was therefore not entitled to summary judgment.

It is undisputed that Patchen read both agreements before signing them, and he understood that the training to be provided by the Fund was to be repaid by him in kind or in cash after his graduation from the program. While Patchen claims to have had no alternative but to sign the agreements when they were presented to him based upon the tuition and time he had already expended, this claim does not constitute duress. *Cf. United States v. Turner,* 660 F.Supp. 1323, 1330–31

(E.D.N.Y.1987) (fact that defendant may have been under strained financial conditions at the time of signing the second agreement does not require a finding that she was left with no alternative but to accept it). While Patchen should have received complete copies of the agreements, his basic understanding of their repayment terms when he signed them prevents him from now relying upon the defense of duress to escape his repayment obligations.

 Patchen also argued to the district court that his purported breach of the agreements, *i.e.,* working for himself, should be "excused," because he was laid off against his will. The district court did not expressly address this argument in ruling on the parties' cross-motions, but did state the following: "It is equally clear that Patchen has been in breach of the scholarship loan agreement since June, 1997. Thus, if the contract is enforceable, Patchen is obliged to pay the Fund the remaining value of the educational benefits he received." If, however, the court failed to address the excuse argument based upon its conclusion that Patchen was entitled to the defense of duress, the court on remand should consider whether the circumstances surrounding Patchen's layoff constitute a breach sufficient to trigger the provision of the agreements that make the balance of his tuition immediately due and payable.[10]

**REVERSED AND REMANDED.**

---

**8.** The 1992 loan agreement expressly provides that it is to be governed by Ohio state law, while the 1989 agreement is silent on the matter. Neither party challenges the district court's application of Ohio state law, so we will apply it here without expressly finding that Ohio state law controls the 1989 agreement on the defense of duress.

**9.** The only "fact" the Fund now disputes is Patchen's assertion that the Fund prevented him from seeking legal advice before signing the agreements. The Fund claims that his decision not to obtain counsel was of his own choosing.

**10.** Paragraph 6 of the 1989 agreement expressly excepts "just cause terminations" from breaches of the agreement. The 1989

agreement is silent on the meaning of "just
cause terminations." David Wellington, the
training director for the Fund, testified that
he "just doesn't know" if layoffs constitute
"just cause terminations" under the agree-
ment. Patchen states only that he was laid
off "through no fault of [his] own." Based
upon the "superseding" language of the 1992
agreement, it is unclear whether the "just
cause" language of the 1989 agreement ap-
plies at all. Under the 1992 agreement, the
Fund is not obligated to secure acceptable

employment for apprentices. While not going
to Patchen's "excuse" argument, the Fund
also points out that Patchen could have, but
did not, exercise the "Waiver of Default" op-
tion of the 1992 agreement, under which an
apprentice who has been unemployed for
more than thirty days can request a waiver of
his obligation to work for contributing em-
ployers from the local committee. Such
waivers are granted in the sole judgment and
discretion of the committee. It is undisputed
that Patchen did not apply for one.